**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ANDRE NOISETTE,

               *Plaintiff*,

    v.

JACOB LEW,
  *Secretary of the Treasury*,

               *Defendant*.

Civil Action No. 11-1594 (RDM)

## <u>MEMORANDUM OPINION</u>

This case is before the Court on the Government's motion for summary judgment, Dkt. 45, and Plaintiff Andre Noisette's motion to strike the Government's supplemental initial disclosures and supplemental reply exhibit, and to designate certain facts to be taken as established. Dkt. 58. Noisette, who is African-American, worked as a law enforcement officer in the Criminal Investigation Division ("CI" or "CID") of the Internal Revenue Service ("IRS"). In the fall of 2006, Noisette applied for a position as the Supervisory Special Agent ("SSA") for CID's St. Petersburg/Tampa office. He was selected for the position and was initially told that he qualified for a 10% pay raise. Before he could assume his new duties, however, he was told that the information he had been given about his eligibility for the raise was mistaken. Instead, he would need to choose between two options: He could accept the position without the increase in pay, or he could reapply for the position through a competitive hiring process, and, if selected, he would be eligible for the raise. He chose to reapply but, after interviews, another candidate was selected for the job. Later that same year, Noisette applied for the SSA position in CID's

Miami office.  He was the only candidate for the job and was hired in December 2006.  He assumed his duties in Miami in July 2007.

After exhausting administrative remedies, Noisette brought this suit alleging that both his "deselection" and subsequent "non-selection" for the St. Petersburg/Tampa SSA position were the product of discrimination on the basis of his race and retaliation for his involvement in the resolution of an Equal Employment Opportunity ("EEO") dispute that arose in CID's Chicago office earlier in 2006.  As to each set of allegations, moreover, Noisette asserted claims under theories of both pretext and mixed motivation, for a total of eight counts.  The parties agree that the two mixed motive retaliation counts are no longer viable in light of the Supreme Court's holding in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2525 (2013) that retaliation claims under Title VII require but-for causation.  *See* Dkt. 45-2 at 10; Dkt. 47 at 29 n.13.  The Court will, accordingly, dismiss those two counts.  Because no reasonable jury could find, based on the existing record, that either race discrimination or retaliation was a substantial factor in Noisette's "deselection" and subsequent "non-selection," the Court will **GRANT** the Government's motion for summary judgment.  The Court will also **DENY** as moot Noisette's motion to strike certain Government disclosures and to designate certain facts to be taken as established.

## I.      BACKGROUND

Because Noisette is the nonmoving party, the Court views the evidence in the light most favorable to him.  *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).  Where the parties have disagreed over details in the factual recitation that follows, the Court has assumed that Noisette's version of events is correct.

**A.      The St. Petersburg/Tampa SSA Vacancy**

CID is the branch of the IRS responsible for investigating violations of the federal tax laws and for supporting prosecutions of criminal violations. *See* Dkt. 48-1 at 39.  Andre Noisette first joined CID as a revenue agent in 1983. *See id.* at 1; Dkt. 45-1 at 1; Dkt. 48-1 at 40.  In 2000, Noisette was promoted to serve as SSA in CID's Cincinnati, Ohio office. *See* Dkt. 45-1 at 1; Dkt. 48-1 at 1, 40.  Noisette remained in that position until May 2004, when he was selected as Senior Regional Analyst for CID's Mid-Atlantic region, with a duty station in Baltimore, Maryland. *See* Dkt. 45-1 at 2; Dkt. 48-1 at 40.  In that position, Noisette's salary was set at General Schedule level 14 ("GS-14"). *See* Dkt. 48-1 at 40.  His first-line supervisor was Tyrone Barney, the Director of Field Operations ("DFO") for the Mid-Atlantic region; Noisette's role was essentially that of an executive assistant to Barney. *See* Dkt. 45-1 at 2; Dkt. 48-1 at 40.  Shortly after his selection as Senior Regional Analyst, Noisette was selected for a temporary promotion to Assistant Special Agent in Charge of CID's Detroit Field Office for a period of one year. *See* Dkt. 48-1 at 41; Dkt. 55-1 at 3.  After his stint in Detroit, Noisette returned to his position as Senior Regional Analyst in Baltimore. *See* Dkt. 48-1 at 41; Dkt. 55-1 at 3.

On August 7, 2006, CID issued a vacancy announcement for an SSA position in its St. Petersburg/Tampa Field Office.  Dkt. 45-3 at 2.  Noisette and one other CID agent, Angelo Troncoso, a Hispanic male, each applied for the SSA position on August 17, 2006. *See* Dkt. 45-5 (Troncoso application); Dkt. 45-6 (Noisette application); Dkt. 47-1 at 3.  At the time of his application, Troncoso was serving as a GS-13 Special Agent in the St. Petersburg/Tampa Field Office. *See* Dkt. 48-1 at 64; Dkt. 55-1 at 37.  He had previously served as acting SSA in that office from April to June 2005 and from March to July 2006. *See* Dkt. 45-5 at 8.

Under the CID's Leadership Development Program, SSA positions are considered "Frontline Positions." Dkt. 45-4 at 7. This designation carries with it certain programmatic conditions. First, the Leadership Development Program guide specifies that "[i]nterviews are required for frontline positions," although the Deputy Chief of CID may waive this requirement. *Id*. at 17 (emphasis removed). Second, the guide further specifies that, in order "to receive a highly qualified determination for entry into Frontline Management positions," applicants must have successfully participated in the Frontline Leader Readiness Program." *Id*. at 17 (emphasis removed). Selections are made from the "best qualified" list, which is typically composed of those applicants who have received a "highly qualified" determination. *Id.* But, "[i]f an insufficient number of highly qualified candidates exist, the requirement" of successful participation in the Frontline Leadership Readiness Program "may be waived." *Id.* Third, because the Leadership Readiness Program is "targeted [at] GS-13 Special Agents who are interested in developing leadership skills and considering becoming future CI leaders," the guide encourages GS-13 Special Agents hoping to "maximize[] competitiveness for selection to a frontline management position" to apply to participate in the "Frontline Leader Readiness Program." *Id.* at 23 (emphasis removed).

Noisette has submitted a document that appears to be a job application submitted by Troncoso, stating: "5/12/06-Deputy Chief waived the [Frontline Leadership Readiness Program-Law Enforcement Officer] highly qualified requirement for GS-13s." Dkt. 47-26 at 2; Dkt. 55-3 at 4. The Government argues that that application relates to a different vacancy announcement with a different closing date than the one at issue here, *see* Dkt. 55 at 12 n. 6, but it does not argue that Troncoso in fact completed the program. Because the date of the notice of the waiver is close to the relevant dates in this case, and because of the current procedural posture of this

case, the Court will assume for present purposes that Troncoso did not complete the Frontline

Leader Readiness Program and that that requirement was waived when he applied for the St.

Petersburg/Tampa SSA position.

In the fall of 2006, CID was transitioning from the GS scale to the new IRS "payband"

scale for Frontline Manager positions, including SSAs. *See* Dkt. 45-20 at 3. Agents promoted

into Frontline Manager positions, including SSAs, were eligible for a one-time pay increase of

10% of their previous salary when moving from the GS scale to the payband scale. According to

the IRS's "Frontline Manager Payband Pay Administration Guidance," as amended in July 2006,

"[a]n individual <u>without</u> prior permanent I[nternal] R[evenue] experience [as distinct from

General Schedule (GS) experience] will be eligible for a one-time 10 percent increase in base

pay upon *a permanent competitive movement* (e.g., promotion, reassignment, or change-to-lower

grade) into an F[rontline] M[anager] position for the very first time." Dkt. 47-50 at 2, 7

(underlining in original, italics added). The document lists "S[enior] M[anager], D[epartment]

M[anager], [and] F[rontline] M[anager]" as examples of "permanent I[nternal] R[evenue]

position[s]."[1] *Id.*

On September 14, 2006, Sharon Hyde, a Human Resources ("HR") Specialist, informed

Noisette by email that "interviews are not required to be entitled to the 10% increase." Dkt. 45-

21 at 5. Noisette also claims that "Chris Heard, an HR Specialist, and Simone Simmons, a

Senior Regional Analyst and advisor to the selecting official," confirmed that he would be

eligible for the pay increase if he applied through the vacancy announcement. Dkt. 47-11 at 7.

In addition, Michael Yasofsky, who was then the Special Agent in Charge of the St.

---

[1] Noisette's previous stint as an SSA ended in 2004, at which time IRS frontline managers were
still paid on the GS scale; as a result, his previous experience did not preclude him from
eligibility for the one-time 10% pay increase for first entry onto the payband system.

Petersburg/Tampa office, checked with Hyde to determine if interviews were necessary to select

Noisette for the SSA position, and he was told that they were not.  *See* Dkt. 45-17 at 3.

Nevertheless, during the week of September 18, 2006, Yasofsky—who had not previously met

Noisette—interviewed him in Washington, D.C.  *Id.*; Dkt. 55-1 at 28.  Later that week, Yakofsky

contacted Noisette to inform him that he had been selected for the SSA position.  *See* Dkt. 47-11

at 8.  The weekly "CI Bulletin" dated September 22, 2006, announced that "Andre Noisette,

Senior Analyst, DFO Mid-Atlantic Area, has been selected as a Supervisory Special Agent,

Tampa FO, St. Petersburg POD."  Dkt. 47-27 at 3 (emphasis removed).  On October 10, 2006,

Noisette received authorization to incur relocation expenses for his move to St.

Petersburg/Tampa.  *See* Dkt. 47-11 at 8.

Two days later, however, Barney, Noisette's supervisor in Baltimore, called Noisette and

told him to hold off on incurring moving expenses.  *See* Dkt. 45-1 at 7; Dkt. 48-1 at 62.  Barney

explained to Noisette that, if he wanted the SSA job, he could either accept the position without

the 10% pay increase, or he could interview for the job as part of a competitive process.  *See* Dkt.

45-1 at 7; Dkt. 48-1 at 62.  Barney warned Noisette that, if he chose to go through the interview

process, he was not guaranteed the job.  *See* Dkt. 45-1 at 8; Dkt. 48-1 at 62.  However, if selected

through the competitive process, he would receive the 10% pay increase.  *See* Dkt. 45-1 at 7;

Dkt. 48-1 at 62.  Noisette chose to pursue the pay increase and thus to go through a competitive

interview process.  *See* Dkt. 45-1 at 8; Dkt. 48-1 at 62–63.

Noisette interviewed for the SSA position on October 16, 2006, before a three-person

panel consisting of Pota Coston, the DFO of CID's Southeast region, Yasofsky, the Special

Agent in Charge of the St. Petersburg/Tampa field office, and Victor Lessoff, the Assistant

Special Agent in Charge.  *See* Dkt. 45-1 at 9; Dkt. 48-1 at 63.  Coston was the selecting official.

*See* Dkt. 45-1 at 13; Dkt. 48-1 at 34.  The same panel also interviewed Troncoso.  *See* Dkt. 45-1 at 9; Dkt. 48-1 at 63.

Noisette left his home at 4:00 a.m. to fly to Atlanta, Georgia, where the interview took place.  *See* Dkt. 48-1 at 63; Dkt. 55-1 at 35.  Noisette subsequently admitted that he "believed the interview was an administrative formality."  Dkt. 45-13 at 4.  Nonetheless, he assessed his own performance positively:  He claimed that he "was engaged throughout the interview, provided succinct, responsive answers to the panel's questions, and showed [his] substantial interest in being selected for the position."  Dkt. 47-11 at 9.

None of the three panel members, however, shared Noisette's perception.  Coston, the selecting official, thought that "[Noisette's] answers were very long and dragged out.  He stared out the window as he answered the questions[,] which gave the appearance he was somewhat distracted or disinterested in the interview."[2]  Dkt. 45-14 at 4.  Similarly, Lessoff recalled that on the first question, Noisette "rambled on about his accomplishments and himself.  He gave us a lot of information but nothing that really told us much.  It was a long-winded answer that didn't come off very well."  Dkt. 45-15 at 8.  He "remember[ed] also that [Noisette] didn't look at Mike [Yasofsky] or Pota [Coston] all that much throughout the interview.  At times he looked out the

---

[2]  Pota Coston passed away on July 3, 2015.  *See* Dkt. 47-25 at 2.  She was not deposed in this litigation, but did execute a sworn declaration in the administrative proceeding.  *See* Dkt. 45-14. Plaintiff objects that the statements in her declaration are inadmissible hearsay.  *See* Dkt. 47 at 31–33.  The Court cites Coston's statements not as proof of the truth of the matter asserted however (e.g. that Noisette's answers *actually were* long and dragged out), but rather as proof of Coston's own subjective impressions (that she believed Noisette's answers to have been long and dragged out).  *See, e.g.*, *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d. 20, 52 n. 53 (D.D.C. 2005) ("The Court notes that no hearsay issues are raised in this case . . . because the . . . statements are being offered not for the truth of the matter asserted, but to demonstrate [the declarant's] state of mind and knowledge.")  In any event, there is no evidence that Coston's reaction differed from that of the other panelists.  More importantly, there is no evidence that Coston personally bore any discriminatory or retaliatory animus toward Noisette.

window.  It wasn't a good presentation." *Id.*  And Yasofsky likewise recalled that "when Andre

[Noisette] had his interview, he wasn't very focused, was distracted looking out the window

quite a bit and looked to the far right quite a bit.  I remember the first question where he went off

about non-related experiences early in his career.  It was an okay interview but not a very good

interview." Dkt. 45-17 at 5.  Subsequent to the interview, Coston called Debra Popoli, an HR

specialist who had been involved in the selection process for the St. Petersburg/Tampa SSA

position, and told her that "Andre [Noisette] was not considered the best candidate for the

position" and that "Andre [Noisette] did not do well in the interview."  Dkt. 45-20 at 6.

According to the panelists, Troncoso, in contrast, performed well at the interview.

Coston recalled that he "was well prepared and had a long term detail as acting SSA," that he

"was able to effectively articulate how he could lead this group," and that "[h]e had a great deal

of passion and excitement in his answers." Dkt. 45-14 at 4–5.  Lessoff thought that "Angelo

[Troncoso] was very confident.  His first answer was shorter and to the point." Dkt. 45-15 at 8.

Although "[n]othing really hit[] [Lessoff] that hard on the other questions," he was "more

impressed with Angelo [Troncoso] at the end of the day than Andre [Noisette]." *Id.*  And

Yasofsky's "recollection [was] that Angelo [Troncoso] had a very strong interview, came across

quite well and had a much better interview than Andre [Noisette]." Dkt. 45-17 at 5.  Both

Lessoff and Yasofsky recommended that Coston select Troncoso.  *See* Dkt. 45-15 at 10; Dkt. 45-

17 at 5.  A week later, Yasofsky notified Noisette that Troncoso had been selected.  *See* Dkt. 48-

1 at 63.

Less than two months later, on December 4, 2006, Noisette interviewed for an SSA

position in CID's Miami office.  *See* Dkt. 45-1 at 14; Dkt. 48-1 at 64.  Pota Coston was again the

selecting official and one of three members of the interview panel.  *See* Dkt. 45-1 at 14; Dkt. 48-

1 at 64.  Noisette was the only candidate; he was selected on December 6, 2006, and he received

the 10% pay raise for first-time entry into a frontline management position.  *See* Dkt. 45-1 at 14–

15; Dkt. 48-1 at 65.

**B.      The Peebles Settlement**

Noisette alleges that his travails involving the St. Petersburg/Tampa SSA position were

due to the role he played in the resolution of an EEO complaint filed by Sarah Peebles, a trainee

in CID's Chicago field office, almost six months earlier.  Peebles initiated the EEO process in

the spring of 2006, when she contacted EEO specialist Lisa Thomas, alleging that she was not

being given meaningful work assignments or training opportunities and that she was being

subjected to a hostile work environment.  *See* Dkt. 49-7 at 8.  Peebles complained, in particular,

about three of her managers:  Assistant Special Agent in Charge Christopher Pikelis, SSA Tanya

Brewer, and On-the-Job Instructor Scott Lindauer.  *See* Dkt. 47-12 at 4.

Thomas, in turn, contacted Tyrone Barney, the DFO with responsibility for the Chicago

office, in March 2006.  *Id.*  Barney then directed Noisette to "look into [Peebles's] allegations

and report his findings back to [him]."  *Id.*  Noisette obtained and reviewed the training progress

reports for all of the new agents in Chicago and in the neighboring Indianapolis field office.  *See*

Dkt. 47-11 at 4.  Peebles's training record was blank, which Noisette concluded indicated that

"she was not given the chance to attend necessary new agent training sessions" and that "she was

not given the same opportunities as other trainees to perform basic duties, such as conducting an

interview."  *Id.*  Noisette, accordingly, reported to Barney that "it appeared that Ms. Peebles had

not been given an opportunity to succeed and that her allegations of discrimination and

retaliation were well-founded."  *Id.*

Barney called an "all manager meeting with Peebles' management" in Baltimore on March 26, 2006, to go "over her complaint and to discuss the possible resolution of it." Dkt. 47-12 at 5. In attendance were Barney, Noisette, Thomas, the three managers who were the subject of Peebles's complaint—Pikelis, Brewer, and Lindauer—and the Special Agent in Charge of the Chicago office and the Director of CID's EEO office. *Id.* at 5–6. At that meeting, Noisette presented his findings about Peebles's record and "stated that it appeared that Ms. Peebles was being treated disparately in comparison to the other new agents in the Chicago Field Office." *Id.*; *see also* Dkt. 47-11 at 4. Following the meeting, matters between Peebles and her supervisors continued to deteriorate. Noisette again obtained Peebles's records, and advised Barney that Peebles intended to file a formal EEO complaint. Dkt. 47-11 at 5.

At that point, Barney, Thomas, and Noisette began working with EEO specialists at both the CID and IRS agency-wide level to put together a settlement resolving Peebles's complaint. *Id.*; Dkt. 47-12 at 7–8. Barney ultimately entered into a settlement agreement with Peebles on behalf of CID, under the terms of which Peebles would be relocated to another office with all expenses paid; she would not be under the direct supervision of Pikelis, Brewer, or Lindauer during her three-year initial training period; all negative information would be removed from her official personnel file; Pikelis, Brewer, and Lindauer would be required to undergo diversity training; and Peebles would withdraw her pre-complaint. *See* Dkt. 47-44. Barney executed the settlement on May 19, 2006. *Id.* at 6.

Pikelis, Brewer, and Lindauer were distraught about the settlement as executed. On May 24, 2006, Pikelis emailed John Imhoff, who was serving as acting Deputy Chief of CID at the time, *see* Dkt. 49-3 at 21, to complain about the settlement agreement, *see* Dkt. 47-39. Because Noisette's allegations of retaliation and race discrimination turn in large part on the motivations

of CID's senior management in their handling of the Peebles issue from this point forward, the

Court will quote Pikelis's email to Imhoff in full:

> John –
>
> I am appealing to you for assistance and guidance with this matter.  I am not sure how much longer you will be in your present position, and if necessary, have no objection to you sharing this information with Acting Deputy Chief Riche, or Chief Jardini.  *I realize that we enjoy a personal relationship as well*, and am concerned that by sending you this message, I place you in a difficult spot.  You should know that I would not do this unless it was absolutely necessary.  You should also know that SAC Tichenor has no knowledge of this communication.  SSA Brewer is with me as this correspondence is crafted.
>
> A few weeks back in Phoenix, I described to you a number of issues we are experiencing in the Chicago Office with Special Agents that recently were converted from the Student Trainee program.  One such issues involving Sarah Peebles has escalated to a point where I believe that not only the integrity and judgment of myself is under question, but the integrity and judgment of SSA Tanya Brewer and SA/O[n-the] J[ob] I[nstructor] Scott Lindauer as well.  We believe that the present handling of this matter presents a serious risk to the public as well.
>
> You should know that *this agreement executed by DFO Barney was never discussed with any personnel in this office* (with the exception of SA Peebles) prior to its execution.  To be fair, as Acting SAC last week, I did receive a voice message from DFO Barney this past Friday, where he advised that he was in the process of reviewing and approving this settlement agreement which would cause the transfer of Special Agent Peebles to the Cincinnati Field Office.  Additionally, I was instructed to allow Special Agent Peebles to attend CPE with that office this week.  No additional details were presented.
>
> For the majority of this week, I am working down in the Fairview Office.  During a range session yesterday afternoon, I received a message from my Secretary Tamara Ellis advising that the attached had arrived via fax.  I asked her to provide the original to SAC Tichenor and scan and e-mail the document to myself and SSA Brewer.
>
> The three of us (myself, SSA Brewer, and SA Lindauer) have reviewed this document and are concerned with its potential impact.  *Although the document clearly states that neither party is at fault, the three of us are required to take courses involving diversity training sometime over the next six months. Additionally, the three of us cannot have any direct supervision over Special Agent Peebles during her probationary period which ends during May of 2008.  This unfairly limits the promotional opportunities for the three of us respective to the*

*Cincinnati Field Office. It also seems unreasonable that Special Agent Peebles will be located to the Cincinnati Office at taxpayer expense.*

Of greater concern, it appears as though the entire EEO process was circumvented. It is our understanding that the EEO process is intended to be fair to all parties whereby an independent investigation should be conducted. In this instance, the only person that appears to be consulted and relied upon was Special Agent Peebles. To be fair, DFO Barney did meet with us at the all manager meeting to discuss the Peebles matter, however, *the Chicago management team (myself, SSA Brewer, and SAC Tichenor) were not aware that DFO Analyst Andre Noisette, EEO Director Oliphant and EEO Specialist Lisa Thomas would be present*, and that out decisions would be questioned unfairly. You should know that this meeting was called at the last minute in Baltimore, and as a result, we were not in a position to produce our documentary proof of her substandard performance. *Neither DFO Barney nor the EEO staff has provided the management team with an opportunity to present the evidence of Special Agent Peebles' lack of performance and poor judgment, and dismiss our concerns as a lack of feeling for cultural issues.*

LR Specialist Carol Black was of the opinion that enough evidence of sub-standard performance existed and she was of the opinion that Special Agent Peebles should be terminated. Additionally, Special Agent Peebles performed at a low level as a Student Trainee, but was moved through the process because of other decisions made by then DFO Pappillion (for example, another Student Trainee received a termination letter, but the SAC was directed to withdraw it after two days). As a result of this experience, our office gave Special Agent Peebles the "benefit of the doubt" and she went to FLETC. Director Timm and Assistant Director Lanham will tell you that Special Agent Peebles struggled at FLETC, not only with performance, but also with judgment. You should know that certain counseling memorandums were not included in the FLETC personnel package received by this office, and SSA Brewer contacted Class Advisor Lynn Rose to obtain her performance rating. SSA Rose discussed her concerns about the judgment of Special Agent Peebles and referenced counseling memorandums which now are in our possession. With the attached agreement, our agency is required to "purge" anything of a negative nature involving Special Agent Peebles within 45 days of the agreement. We cannot understand how this is the right thing to do, and believe that this poses a threat to the public and reputation of our agency.

I think you can understand what our concerns are. Although nobody was found at fault in the agreement, the three of us will now be required to take diversity training. We question why this is necessary if nobody was at fault. Also, we are concerned that something of a negative nature will be included on any of our performance evaluations. Our understanding is that this will not be the case, but nonetheless, this is a concern. SAC Tichenor has advised us that he believes that we have done nothing wrong or improper and has expressed frustration over the handling of matters in this office.

The three of us believe that we are on reasonable ground with our request which is based on the fact that executive level decisions were made without proper investigation or proper consultation, and that these decisions may impact promotional opportunities for the three of us, harm our reputations and our agency. With this in mind, we are requesting your intervention as Acting Chief and request that this matter be investigated to ensure that it is fair and reasonable to all parties involved, and that the proper and fair steps were taken throughout this process. We find it unsettling that the agency is willing to pay a full move for an employee that was expected to be terminated just a short month ago, and that the three of us appear to be the ones at fault. The agency can take whatever course it wants, but it is our request that, at a minimum, paragraphs 1d and 1e be stricken from the attached document.

I will be traveling back north mid-morning on Thursday. I am available by cellular if you and / or Acting Deputy Chief Riche find merit with these concerns and wish to discuss. *You have known the parties involved for some time*. This time, your intervention and assistance is greatly needed.

Thanks for taking the time to review this request.

Dkt. 47-39 (emphases added).

Imhoff replied two days later, saying "I shared this with Ken Riche who also has some concerns[.] . . . There are some pieces missing that I need to get a better handle of. I don't know what documentation was looked at by the EEO folks and Ty[rone Barney]'s staff nor what you all provided." Dkt. 47-46 at 3.

Pikelis subsequently emailed Byram Tichenor, the Special Agent in Charge of the Chicago Office, to complain about the settlement agreement. *Id.* at 2–3. That email did not mention Noisette. In it, Pikelis complained that "[b]ased on the information presented below and discussed, it appears as though this agreement and terms were crafted individually and collectively by DFO Barney and the HQ EEO Office (Lisa Thomas presumably acting under the direction of EEO Director Oliphant), without the knowledge of HQ executives, Chicago Field Office Management or, with the exception of SA Peebles, the other impacted parties (Myself, SSA Brewer, SA Lindauer) or without proper investigation." *Id.* at 2.

Pikelis, Brewer, and Lindauer, filed a formal EEO grievance on June 13, 2006,

complaining about the Peebles investigation and settlement. *See* Dkt. 47-37. That document,

over the course of nineteen single-spaced pages, mentioned Noisette five times (including the

brief mention of Noisette in Pikelis's email to Imhoff, which the grievance quoted in full):

- To be fair, DFO Barney did meet with us at the all manager meeting to discuss the Peebles matter, however, the Chicago management team (myself, SSA Brewer and SAC Tichenor) were not aware that DFO Analyst Noisette, EEO Director Oliphant and EEO Specialist Lisa Thomas would be present, and that our decisions would be questioned unfairly.

- On March 16, 2006 DFO Analyst Andre Noisette requested all the training progress records of all Chicago Field Office Special Agents and SASTs hired in or subsequent to FY 2004. No further explanation was given or requested and all the training progress records were provided.

- In addition to the Chicago Field Office Management team and DFO Barney, DFO Analyst Andre Noisette, EEO Director Charod Oliphant and EEO Specialist Lisa Thomas were present. It should be known that the presence of the latter three persons was not made known to the Chicago field office management team.

- DFO Analyst Noisette then discussed the level of detail contained within the training progress record.

- O[n the] J[ob] I[nstructor] Lindauer asked SA Peebles to turn in the progress record on several occasions, but SA Peebles failed to do so until receiving the instruction from SSA Brewer in response to the request from DFO Analyst Andre Noisette.

Dkt. 47-37 at 4, 11, 12, 15.

Ken Riche, who replaced Imhoff as acting Deputy Chief, *see* Dkt. 49-6 at 8–9, forwarded

the email Pikelis sent to Imhoff to Nancy Jardini, the Chief of CID. *See* Dkt. 49-4 at 16.

Starting in June 2006, Jardini "contacted [EEO Specialist Lisa Thomas] regarding [the Peebles]

situation on several occasions," met with her "three or four times," and "sent . . . questions

regarding this situation as well." Dkt. 47-20 at 6. During her conversations with Thomas,

Jardini "made comments to the effect that she knew SSA Brewer, ASAC Pikelis and OJI/SA

Lindauer and that they were good people and excellent agents." *Id.* at 7.  Thomas claimed to "have never witnessed a Chief become as involved in the EEO process as Chief Jardini did here with SA Peebles," and her overall "impression [was] that Chief Jardini engaged in gross mismanagement of authority against [Barney] for his participation in SA Peebles' EEO complaint." *Id.*

On July 19, 2006, Jardini circulated a draft of a superseding settlement agreement between CID and Peebles, which kept in place Peebles's transfer and most of the expungement of negative personnel file information, but dropped the bar on Pikelis, Brewer, or Lindauer supervising Peebles and the requirement that they undergo diversity training.  *See* Dkt. 47-40. Jardini instructed Barney to sign the superseding agreement, thus revoking the initial settlement. *See* Dkt. 47-12 at 9–10.

Two weeks later, on August 2, 2006, Jardini revoked Barney's authority over the Chicago field office, saying that "she could not trust [Barney's] objectivity in dealing with the Chicago Field Office management team" in light of his handling of the Peebles issue.  *Id.* at 10.  Jardini later removed Barney from the Mid-Atlantic DFO position altogether, involuntarily reassigning him to a "much less desirable, unclassified, temporary, and previously non-existent non-supervisory position as a 'project leader' in Lanham, MD," on October 24, 2006.  *Id.*  The same day, she proposed to suspend Barney for thirty days without pay, again specifically citing his handling of the Peebles issue.  *Id.*  In November 2006, Barney received a "minimally satisfactory" rating on several categories in his annual performance appraisal.  *See* Dkt. 47-58. Imhoff, who had returned to the office as permanent Deputy Chief, issued the appraisal and informed Barney that the ratings were due to his handling of the Peebles complaint.  *See* Dkt. 47-

12 at 11.  After exhausting his administrative remedies, Barney filed suit in federal court alleging

discrimination and retaliation.  *Id.*  That case settled before the start of discovery.  *Id.*

**C.       The Present Action**

After exhausting his own administrative remedies, Noisette brought the present action in

September 2011.  The case was originally assigned to Chief Judge Roberts, but reassigned to the

undersigned judge in December 2014.  Discovery closed on June 30, 2015, with the exception of

one deposition, which occurred in July 2015.  *See* June 19, 2015, Minute Order.  The deciding

official for purposes of Noisette's nonselection, Pota Coston, died on July 3, 2015, after the close

of discovery.  *See* Dkt. 47-25.  Subsequently, the Government moved for summary judgment.

Noisette opposed that motion and separately moved to strike the Government's supplemental

initial disclosures and a supplemental declaration the Government submitted along with its reply

brief, as well as to designate certain facts to be taken as established.

**II.  STANDARD OF REVIEW**

The moving party is entitled to summary judgment under Federal Rule of Civil Procedure

56 if it can "shows that there is no genuine dispute as to any material fact and [that it] is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When, as here, the plaintiff bears the

ultimate burden of proof, but the defendant has moved for summary judgment, the defendant

"bears the initial responsibility" of "identifying those portions" of the record that "demonstrate

the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  A fact is "material" if it could affect the substantive outcome of the litigation.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott*

*v. Harris*, 550 U.S. 372, 380 (2007).  The Court, moreover, must view the evidence in the light

most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor.  *Talavera*, 638 F.3d at 308.

"Although summary judgment is not the occasion for the court to weigh credibility of evidence, . . . summary judgment is appropriate if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* (internal citations and quotation marks omitted). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.

### III.  DISCUSSION

Title VII of the Civil Rights Act prohibits the federal government from discriminating in employment on the basis of race, *see* 42 U.S.C. § 2000e-16, and from retaliating against employees for engaging in activity protected by Title VII, *see* 42 U.S.C. § 2000e-3(a); *Ethnic Emps. of Library of Cong. v. Boorstin*, 751 F.2d 1405, 1415 n. 13 (D.C. Cir. 1985).  In a case in which the plaintiff lacks direct evidence of discrimination or retaliation, the burden shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies, under which the plaintiff must first make out a prima facie case of discrimination or retaliation, and the burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its action.

*See, e.g.*, *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113–14 (D.C. Cir. 2016) (race discrimination); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (retaliation).

Once an employer has proffered a legitimate nondiscriminatory reason for its action, however, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). At that point, the only question for the Court is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). That same rule, moreover, applies in Title VII retaliation cases; once the employer comes forward with a legitimate, nonretaliatory justification for its action, the focus of the litigation moves to the question of whether there is sufficient evidence for a reasonable jury to find that the asserted rationale is pretextual and that the real reason for the employer's action was to retaliate against the employee for engaging in protected activity. *See Jones*, 557 F.3d at 678 (applying *Brady* to retaliation claim).

Finally, a plaintiff can establish a discriminatory employment practice under Title VII in one of two ways. Under the "'single-motive' or 'pretext' theory of discrimination," the plaintiff must show that a protected characteristic was a but-for cause of the adverse employment action. *See Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007). And under the "motivating factor" standard, also known as the "mixed-motive" standard, a plaintiff can prevail by showing that a protected characteristic was a motivating factor in the adverse employment action. *See Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012). The more forgiving "motivating factor"

standard, however, is not available for retaliation claims; a plaintiff alleging retaliation can prevail only by showing but-for causation. *Nassar*, 133 S. Ct. at 2534.

A.      The "Deselection"

Noisette points to three pieces of circumstantial evidence that he claims would permit a reasonable jury to conclude that his "deselection" was either the product of racial discrimination or undertaken in retaliation for his participation in the Peebles settlement: First, he argues that CID has a history of engaging in race discrimination; second, he argues that the explanation given for his "deselection" is not credible; and third, he argues that a comparable white candidate with no prior EEO activity was assigned to a payband position with a 10% pay increase without even having been interviewed.

Before turning to each of these arguments, the Court notes that "deselection" is not the most precise way to describe what, as a matter of undisputed fact, happened here. Noisette was selected for the St. Petersburg/Tampa SSA position, and, before he was selected, he was told that he would qualify for the 10% pay increase. *See* Dkt. 45-21 at 5; Dkt. 47-11 at 7. CID subsequently told him that the advice he had received about the pay increase was incorrect and that, if he wanted the pay increase, he would need, in essence, to re-apply for the position. *See* Dkt. 45-1 at 6–7; Dkt. 48-1 at 62. He was also told, however, that he could accept the SSA position without the pay increase. As the Government correctly notes, Noisette only lost the position because he decided to re-apply in hopes of securing the 10% pay increase. In short, he was not "deselected" for the position, but rather deprived of the 10% pay increase that he was told would accompany the position. In the end, however, this is more a battle over nomenclature than substance. Whether treated as a *lost position* or *lost pay increase*, Noisette has suffered an

adverse employment action.[3]  The Court, accordingly, need not further address this issue and simply uses Noisette's "deselection" nomenclature as a shorthand.

The Court takes each of Noisette's arguments in turn but also considers their cumulative weight.

1.     *Alleged History of Discrimination and Retaliation*

Noisette first alleges that CID has a history of discriminating and retaliating against African-American employees.  He is, of course, correct that "evidence of discriminatory statements or attitudes on the part of [an] employer," *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998), and "the employer's general policy and practice with respect to employment of minorities," *Parker v. Dep't of Hous. & Urban Dev.*, 891 F.2d 316, 321 (D.C. Cir. 1989), are at times probative of whether an employer's justification for taking an adverse action is pretextual.  The same is true, moreover, in a retaliation action; evidence that an employer retaliated against other employees in the same protected class may be probative of whether the employer's proffered reason for taking an adverse action against the plaintiff was pretextual.  *See Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015).  But the weight, if any, that a reasonable jury might accord such evidence is highly fact-dependent, and the Court must consider whether there is evidence from which a reasonable jury could infer that whatever discriminatory or retaliatory attitudes motivated *other* allegedly unlawful acts might have also

---

[3]  One possible question is whether the relevant employment action was Imhoff's failure to waive the requirement that Noisette compete for the SSA position as a precondition of receiving the 10% pay increase, and, if so, whether the failure to waive an otherwise applicable rule constitutes an adverse employment action.  Here, however, there is at least a reasonable dispute of fact about whether Imhoff could have waived the competition requirement (as, potentially, distinct from the interview requirement) and whether, in similar circumstances, either he or other members of the CID management team would likely have done so.  For present purposes, the Court thus assumes that Noisette suffered an adverse employment action.

infected the actions taken against the plaintiff.  Here, Noisette points to Jardini and Imhoff's

actions against Barney; Pikelis, Brewer, and Lindauer's alleged discrimination against Peebles;

and similar concerns "shared by many of her African[-]American counterparts in the Chicago

Field Office."  Dkt. 47 at 35.

According to Noisette, "the most damning evidence that [CID's] treatment of . . .

Noisette was retaliatory and discriminatory . . . is [CID's] contemporaneous and equally

egregious treatment of . . . Barney."  Dkt. 47 at 34.  All agree that CID's actions against Barney,

including removing him from supervision of the Chicago office, and later from his role as DFO,

along with the negative performance appraisal and proposed thirty-day suspension, were the

result of his involvement with the Peebles settlement.  Noisette and Barney claim that CID

management acted out of racial and retaliatory animus, *see* Dkt. 47 at 30, 34–35; Jardini, in

contrast, claims that Barney lied to her about a number of key matter relating to the investigation

and settlement, demonstrating a lack of integrity unbecoming a senior CID manager, *see* Dkt. 49-

4 at 27; *see also* Dkt. 47-18 at 12.  Given the procedural posture, the Court will assume that a

reasonable jury could find that CID discriminated against Barney on the basis of his race and

retaliated against him for his involvement in Peebles's EEO process.  The relevant question,

however, is whether Noisette stood in a sufficiently similar posture such that a reasonable jury

could infer that he too was the victim of racial discrimination and retaliation.  As explained

below, the Court concludes that it could not.

Barney's problems stemmed from his role in the Peebles investigation and initial

settlement agreement.  In May 2006, Pikelis (along with Brewer) emailed Imhoff to complain

about the settlement agreement, which—unfairly in their view—required Pikelis, Brewer, and

Lindauer to take diversity training courses and precluded them from supervising Peebles during

21

her training period.  *See* Dkt. 47-39.  They also complained that the only person who was

interviewed as part of the EEO process was Peebles and that "[n]either DFO Barney nor the EEO

staff has provided the management team with an opportunity to present the evidence of Special

Agent Peebles['s] lack of performance and poor judgment," dismissing their "concerns as a lack

of feeling for cultural issues."  Dkt. 47-39 at 3.  Imhoff responded that he had shared the email

with Kenneth Riche, who was scheduled to replace him as acting Deputy Chief; that Imhoff

would be on leave to the next two weeks but would follow up on that matter; and that he had

attempted to call Pikelis and Tichenor, the Special Agent in charge of the Chicago Office, but

that they were apparently "on leave for the long weekend."  Dkt. 47-37 at 6.  A few days later,

after Riche replaced Imhoff as acting Deputy Chief, Pikelis sent a second email to Tichenor in

which he urged Tichenor to "elevate[ ]" the matter to "Riche and/or Chief Nancy Jardini" and

cautioned that he, Brewer, and Lindauer would file their own grievance if the matter was not

"swiftly" resolved with CID.  Dkt. 47-46 at 2.  On behalf of all three, Pikelis requested that the

"entire [settlement] agreement . . . be voided," or, if that was "not possible," that the paragraphs

requiring that they receive EEO training and precluding them from supervising Peebles be

omitted.  Id. at 3.  Two weeks later, Pikelis, Brewer, and Lindauer filed an EEO grievance,

arguing that "the EEO process was circumvented in that no substantive independent review of

both sides was conducted by DFO Barney or the EEO Office, and that the terms of [the Peebles

settlement] agreement bind them to unneeded diversity training and limit their promotional

opportunities."  Dkt. 47-37 at 2.

   The only evidence that Jardini or Imhoff had of Noisette's role in the Peebles affair is that

he collected training files for Chicago and Indianapolis trainees and attended a meeting at which

he presented his findings "that it appeared that . . . Peebles was being treated disparately in

comparison to the other new agents in the Chicago Field Office." Dkt. 47-12 at 6.  More importantly, however, there is no evidence that Pikelis, Brewer, or Lindauer—or anyone else— raised any objections or concerns about Noisette's actions with CID's senior management. Indeed, despite their extensive and open criticism of Barney, their correspondence objecting to the investigation and settlement and their formal EEO filing mention Noisette only in passing. Pikelis's email to Imhoff merely noted that Noisette was present at the meeting that Barney convened to discuss the Peebles matter, and the grievance that he filed along with Brewer and Lindauer merely repeats this observation and further notes that Noisette requested "training progress records" from the Chicago Field Office and that he "discussed the level of detail contained within the training progress record[s]" at the meeting.  Dkt. 47-37 at 11–12.  Their ire was unmistakably directed at Barney, not Noisette.  But Noisette's theory is that Imhoff and Jardini became involved in the Peebles affair at the behest of Pikelis—Imhoff considered Pikelis a friend, and Jardini considered him a protégé.  *See* Dkt. 47 at 7.  There is no evidence that this hostility extended to Noisette, who—unlike Barney—was not the target of the open and unguarded complaints that Pikelis, Brewer and Lindauer raised with CID senior management.

Even more importantly, there is no evidence that Jardini or Imhoff were even aware that Noisette played anything more than a ministerial role in the Peebles matter.  There is no evidence, for example, that Jardini or Imhoff had any awareness of Noisette's involvement in crafting the Peebles settlement.  On Noisette's own version of events, Jardini was responsible for the vast majority of the actions taken against Barney.  Only two pieces of documentary evidence bear on Jardini's knowledge of Noisette's role in the Peebles matter.  First, she received a copy of the email that Pikelis sent to Imhoff.  *See* Dkt. 49-4 at 20.  But that email merely reports that Noisette attended the meeting.  *See* Dkt. 47-39 at 2.  Second, she saw a copy of the EEO

grievance that Pikelis, Brewer, and Lindauer filed.  *See* Dkt. 47-18 at 6, 7.  That document, however, only repeats what was already in the Pikelis email and adds the fact that Noisette requested certain training progress reports from the Chicago Field Office and "then discussed the level of detail contained within [those] training progress record[s]" at the meeting.  Dkt. 47-37 at 12.  There is no evidence that Jardini was aware—or believed—that Noisette performed any action involving his own judgment or discretion or that he performed anything other than these ministerial tasks.  When asked in her deposition for her understanding of what role Noisette played in the Peebles matter, moreover, Jardini answered "I'm not aware he played any role . . . there was a meeting during . . .  I don't recall.  It must have been a manager meeting . . .  And I believe Andre [Noisette] was in that meeting, but I'm unaware, as I sit here, I'm not – I don't recall any specific role he had in it."  Dkt. 49-4 at 34.

Noisette disagrees, arguing that Jardini's "understanding of the situation was that . . . Pikelis felt that the settlement was not executed properly and *felt he was being treated unfairly by . . .* Barney *and . . . Noisette*."  Dkt. 47 at 13 (citing Jardini deposition) (emphasis added).  That characterization of Jardini's testimony is incorrect; she, in fact, denied any awareness of any role that Noisette played in the Peebles matter other than attending the single meeting, and she did not testify, or even suggest, that Pikelis felt that Noisette had treated him unfairly.  *See* Dkt. 49-4 at 17, 20, 21.  But, even if the Court were to disregard Jardini's undisputed testimony, Noisette has not carried his burden of presenting even a scintilla of evidence that Jardini knew anything more about Noisette's involvement in the Peebles matter than what appeared in Pikelis's email to Imhoff and in the Pikelis-Brewer-Lindauer grievance—that is, that Noisette attended the May 26, 2006, all-managers meeting along with Barney, Oliphant and Thomas; he requested records in advance of the meeting; and he "discussed the level of detail contained" in

those records at the meeting. *See* Dkt. 47-39; Dkt. 47-37. There is no evidence that anyone—including, most critically, Jardini—regarded any of these tasks as more than ministerial in nature, or that anyone took *any* offense at how Noisette performed them.

Imhoff, in turn, played a substantially smaller role in the Peebles matter, although he did receive the initial email from Pikelis and did deliver Barney's annual performance evaluation. *See* Dkt. 47-39; Dkt. 47-58; Dkt. 47-12 at 11. As explained above, the only correspondence that Imhoff received about the Peebles matter was the email he received from Pikelis. Over the course of eleven paragraphs, Noisette's name appears only once, when Pikelis notes that Noisette, along with Oliphant and Thomas, attended the March 26, 2006, meeting, and that he the other members of the Chicago management team were not provided advance notice that Noisette, Oliphant, and Thomas would attend. *See* Dkt. 47-39 at 2–3. Unlike Jardini, moreover, there is no evidence that Imhoff ever saw the Pikelis-Brewer-Lindauer grievance, and he testified that he did not even recall whether they filed a grievance. Dkt. 49-3 at 29.

Imhoff's role in the Peebles matter was cut short because, at the time he received the Pikelis email, he was serving in an acting capacity as Deputy Chief of CID, *see* Dkt. 47-39 at 2; Dkt. 49-3 at 21, and he left that position to return to his permanent position as DFO of the North Atlantic area within a week of receiving the email, Dkt. 47-5 at 28. He did not return as permanent Deputy Chief until August 2006. Dkt. 49-3 at 29. After receiving the Pikelis email, Imhoff unsuccessfully attempted to call Pikelis and Tichenor, Dkt. 47-37 at 6, but there is no evidence that they ever spoke about the matter. Nor is there any evidence that Imhoff had any further involvement with the Peebles matter while he was away from headquarters in his position as North Atlantic DFO. In an uncontroverted declaration, Imhoff attests that he "was not involved in the Sarah Peebles issue other than being briefed on what occurred. I was at the end

of my detail as Deputy Chief in May of 2006 when much of this transpired and I was not in the decision process but was briefed on this matter." Dkt. 47-17 at 2.

Noisette argues that Imhoff knew more than this, pointing to his declaration that he "knew of [Noisette's] involvement in the Sarah Peebles matter but not all the nuances," Dkt. 47-17 at 2, and the fact that Imhoff described himself as friends with Pikelis, *see* Dkt. 49-3 at 35. Yet evidence that Imhoff "knew of [Noisette's] involvement in the . . . Peebles matter but not the nuance" adds nothing to the documentary record, which shows that he was aware that Noisette attended the March 26, 2006, meeting. Imhoff's deposition testimony, moreover, adds no further detail on this issue; rather, he testified that, because he was in the process of leaving his post as acting Deputy Chief when he received the Pikelis email, he "most likely" simply passed the matter off to Riche, who was the incoming acting Deputy Chief. Dkt. 49-3 at 26. Moreover, although Imhoff did testify that he was "friends" with Pikelis, he also testified that his contact with Pikelis "was infrequent" in 2006, Dkt. 49-3 at 35, and, more importantly, there is no evidence the Imhoff ever discussed the Peebles matter with Pikelis, Brewer, or Lindauer.

In short, there is no evidence of Imhoff playing any role in the Peebles matter between forwarding Pikelis's email to Ken Riche on May 26, 2006, and delivering Barney's performance appraisal on November 8, 2006. And, critically, there is no evidence that he knew of Noisette's role in the Peebles investigation beyond a single reference to Noisette's attendance at the March 26, 2006, meeting contained in Pikelis's email.

Finally, Noisette contends that he and Barney were "not the only African Americans in CID" who have been subjected to discrimination; that, "Peebles, too, clearly faced discriminatory treatment when [CID] failed to afford her the same opportunities as her Caucasian trainee counterparts;" and that Peebles's "concerns were shared by many of her African-

American counterparts in the Chicago Field Office." Dkt. 47 at 35.  But, there is no evidence

that anyone other than Pikelis, Brewer, and Lindauer discriminated against Peebles—or anyone

else in the Chicago office—or that any of those three individuals played any role in any adverse

action taken against Noisette.  Nor is there any evidence that any of the three ever conveyed any

unhappiness with, or dislike for, Noisette to any other CID employee or officer.  Accordingly,

even if the Court assumes that they engaged in other discriminatory conduct, there is no basis to

infer that their purported attitudes or biases had anything to do with any action taken against

Noisette.

Considering the relevant evidence in the light most favorable to Noisette, *see Talavera*,

638 F.3d at 308, the Court concludes that nothing occurring in the context of the Peebles matter

could reasonably support an inference that Jardini or Imhoff unlawfully discriminated or

retaliated against Noisette.  Unlike with Barney, there is no evidence that anyone involved in that

matter ever expressed any unhappiness or frustration with anything Noisette did or said.  And,

most importantly, there is no evidence that Jardini or Imhoff had any idea that Noisette played

anything other than a ministerial role in that matter.  There is no evidence that Jardini or Imhoff

thought that Noisette did or said anything that, in the view of a reasonable jury, could have

provoked the type of reaction that Noisette posits.  This conclusion is reinforced, moreover, by

the fact that Noisette's theory of the case rests on the notion that Jardini and Imhoff were not

content to punish Barney, but resolved to extend their ire over the Peebles matter to Noisette as

well.  In the case of Barney, however, they did so openly, telling him at every turn that he was

being subjected to adverse employment actions because of his role in the Peebles matter, while,

in the case of Noisette, they allegedly did so covertly, hiding behind CID rules and never

documenting in any way a belief—true or fabricated—that he had done anything wrong. Noisette offers no explanation for this substantial disconnect in his own theory of the case.

Finally, Noisette's theory that Jardini and Imhoff were intent on subjecting him to the same mistreatment that they allegedly imposed on Barney is at odds with the undisputed evidence that less than two months after Noisette was "deselected" for the St. Petersburg/Tampa position, he was selected for the Miami SSA position. Jardini was still Chief of CID at the time, and Imhoff was still Deputy Chief. *See* Dkt. 48-1 at 38. Noisette argues that this later selection is irrelevant because he was the only candidate and because "Mr. Imhoff [and] Ms. Jardini . . . were not involved in Mr. Noisette's selection for the Miami SSA position." *Id.* at 37–38. But that explanation does little to advance Noisette's theory that he was the subject of the same pattern of discrimination and retaliation that was leveled at Barney. In Barney's case, there is no question that Jardini and Imhoff had no difficulty in openly criticizing him and taking formal agency action against him. If the same conduct were applied to Noisette, Jardini and Imhoff could have simply denied Noisette the Miami post for cause. This is not to say that discriminatory and retaliatory conduct must always fit the same mold, but the disconnect between CID's open criticism and punishment of Barney adds to the implausibility of Noisette's contention that a reasonable jury could infer from the alleged mistreatment of Barney that he was also mistreated.

2.      *CID's Asserted Justification for Noisette's "Deselection"*

Noisette also argues that the reason given for his "deselection" was false and that a reasonable jury could infer from that falsity that the true reason for his deselection was discrimination and retaliation. He argues, in particular, that his initial selection was, in fact, a competitive reassignment and that CID officials did not receive the clarification from Human

Resources that it claimed to rely on until after Noisette had been deselected.  If supported by the evidence, these arguments might permit a reasonable jury to conclude that CID's actions were discriminatory or retaliatory.  As the Supreme Court and D.C. Circuit have explained:  "In an appropriate case, '[t]he factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination."  *Aka*, 156 F.3d at 1294 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)) (alterations in original).  As explained below, however, Noisette has failed to identify evidence from which a reasonable jury could infer that CID's proffered justification was not the actual reason for its decision.

Noisette first argues that his *initial* selection was a bona fide competitive reassignment because he applied through an advertised vacancy and was interviewed.  Although the Government in its briefing contests that Noisette's conversation with Yasofsky was an interview, *see* Dkt. 55 at 6, it admits in its response to plaintiff's counterstatement of material facts that the meeting was an interview, *see* Dkt. 55-1 at 28.  Nevertheless, even if *Noisette* was interviewed for the initial SSA selection, there is no evidence in the record that *Troncoso*, who had also applied for the job, was interviewed or even considered before Noisette was selected.  To the contrary, the Government has produced evidence that Noisette was initially selected in the context of "a non-competitive reassignment."  Dkt 47-22 at 2; see also Dkt. 45-15 at 4.  And, in response, Noisette has failed to identify any evidence that Troncoso, or anyone else, was considered for the position as part of the initial process.  *See Laningham*, 813 F.2d at 1241.  Without evidence that any other applicant was considered, no reasonable jury could conclude that Noisette's initial selection was competitive.

Noisette also contends that CID's HR staff clarified the hiring requirements for the SSA position only after "deselecting" him, which he claims shows that its asserted rationale was

pretextual.  This contention hinges on several emails sent by Debra Popoli, an HR specialist in

CID, after Noisette had been "deselected."  On October 12, 2006, the same day that Barney

informed Noisette that he could choose between competing for the position or losing the 10%

pay increase, Popoli emailed several officials at CID, including Imhoff and Coston, on the

subject of "Competitive Reassignments and 10% increase."  Dkt. 47-31 at 2.  In that email,

Popoli stated that "[t]he issue still remains regarding the *competitive* reassignments, and what

constitutes open and fair competition. . . . *[I]t is my opinion that ranking must be done on all*

*applicants being competitively considered*[.] . . .  I am getting further clarification from the . . .

policy office as to what constitutes **competition**."  *Id.* (bold in original) (italics added).  She

concluded that "in terms of the issue we have been discussing, the process needs to be done

competitively (as you are doing)."  *Id.*  A week later, she emailed Riche, who oversaw the HR

office in CID, to say that "[w]e are still working the issue with personnel as to what constitutes a

competitive reassignment for those who will be entering a pay band for the first time and want to

be considered competitively for the 10% increase."  Dkt. 47-32 at 2.  Finally, on October 30,

2006, Popoli emailed several CID officials, including Riche, Barney, Imhoff, and Jardini to

explain that "[t]o be considered as a *competitive* reassignment, an applicant must be ranked (in

our management selection process this means certified as Highly Qualified) and other

competitive processes followed.  CI policy includes interviewing the best qualified supervisory

candidates or obtaining the concurrence of the Deputy Chief, CI to waive interviews."  Dkt. 47-

33 at 2 (emphasis in original).  She further explained that as a result of the transition to the

payband system, "[m]any [current HQ and DFO analysts] do not realize that reassignment as an

SSA . . . position also requires competition if they want to be considered for a 10% salary

increase."  *Id.*

Noisette infers from this sequence of emails that his selection as SSA was revoked before CID management could decide on a reason why his existing selection was invalid, and that it took more than three weeks to come up with a post-hoc justification.  But Popoli's emails do not bear that weight.  The October 12 email said that "the process needs to be done competitively (as you are doing)," Dkt. 47-31 at 2, while the October 30 email concluded that "[t]o be considered as a *competitive* reassignment, an applicant must be ranked . . . and other competitive processes followed," Dkt. 47-33 at 2.  Over the course of three weeks, Popoli's advice evolved from "competition is required" to the modestly more specific "competition is required, which means ranking and competition."  The problem with Noisette's initial selection is equally obvious under either email:  There was no competitive selection because Troncoso was not considered. Regardless of what specific competitive procedures Popoli ultimately determined were required by CID's human resources policies, any conceivable competition would necessarily involve considering other candidates who had applied for the position.  Noisette has offered no evidence, however, that Troncoso or anyone else other than Noisette was ever considered before the initial selection.  Popoli's emails show her efforts to clarify the requirements of the new payband system, which in Riche's words "was very confusing because it was still all in flux," Dkt. 49-6 at 22, and which affected "[m]any" other analysts who "[did] not realize that reassignment as an SSA . . . position also requires competition if they want to be considered for the 10% salary increase," Dkt. 47-33 at 2.  But a reasonable jury could not conclude that they show Popoli attempting to conjure up a reason to retroactively justify "deselecting" Noisette.

3.    *Similarly Situated Employee*

Noisette further argues that CID's promotion of a similarly-situated non-minority woman with no history of EEO activity, Rhonda Speier, from a GS-14 to a SSA payband position,

without requiring that she go through competitive selection or be interviewed, bolsters his claim that he was the victim of discrimination and retaliation.  The evidence does show that Speier was promoted and received the salary bump.  *See* Dkt. 47-51 at 2.[4]  But Noisette fails to identify any competent evidence that her promotion was not competitive, relying instead on his own declaration that "I know for certain that she did not interview before being selected for that position," Dkt. 47-11 at 7, and Barney's declaration that "I'm certain she never had an interview," Dkt. 47-13 at 4.  Neither declaration provides any basis to believe that the declarant has personal knowledge about whether Speier interviewed for the position, *see* Fed. R. Evid. 602, or, more generally, how the declarant came to the emphatic conclusion that Speier did not interview.  The testimony, in short, is the equivalent of an affidavit submitted in a traffic accident case by someone who may, or may not, have been present at the scene, simply asserting, "I'm certain he ran a red light."  The Court cannot credit such testimony.  But, even if Noisette offered competent evidence that Speier did not interview before receiving an SSA position along with the 10% pay increase, the record would still fail to support Noisette's contention that Speier was similar situated.  There is no evidence, for example, that any other *qualified* employee *applied* for the same position Speier obtained.  Accordingly, there is no basis on which a reasonable jury could find that Noisette received disparate treatment.

*   *   *

---

[4] Significantly, the email documenting Speier's promotion and salary increase distinguishes between her "competitive reassignment," which came with a "10% increase," and the "noncompetitive reassignment" of other employees, which left their salaries "the same."  Dkt. 47-51 at 2.

Whether each of Noisette's arguments are considered separately or together, the Court concludes that he has failed to identify competent evidence from which a reasonable jury could infer that CID's stated reason for its "deselection" was pretext for discrimination or retaliation.

**B.     The "Non-Selection"**

Noisette's argument that Coston's failure to re-select him after interviewing him and Troncoso was discriminatory and retaliatory rests on two claims:  First, he claims that he was significantly better qualified than Troncoso.  Second, he claims that the interview panelists failed to keep interview notes, which could lead a reasonable jury to doubt their asserted assessment of his interview performance.

Each of Noisette's non-selection claims runs into the problem that Pota Coston was the deciding official, and there is no evidence or allegation that she (or Yasofsky or Lessoff) harbored any discriminatory or retaliatory animus toward Noisette.  As Noisette's briefs correctly point out, it is not the case that only the motivations of the deciding official matter in an employment discrimination or retaliation case.  *See* Dkt. 47 at 30 (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)).  But the plaintiff must still show a causal link between alleged incidents of discrimination and retaliation and the deciding official's ultimate decision.  *See Staub*, 562 U.S. at 419.  Under the so-called "cat's paw theory of discrimination," for example, an employer can be liable when a direct supervisor harbors discriminatory animus and influences the ultimate decision maker, even if that decision maker lacks any discriminatory animus.  *Id.*  To prevail on a "cat's paw" theory, the plaintiff must show that "(1) [the direct] supervisor perform[ed] an act motivated by discriminatory animus (2) that [was] *intended* by the [direct] supervisor to cause an adverse employment action, and . . . (3) that act [was] a proximate cause of the ultimate

employment action." *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (quoting *Staub*, 562 U.S. at 422) (emphasis in original).

Noisette alleges that Coston acted as the cat's paw for Imhoff, whose decision to have Noisette "deselected," he alleges, was intended to cause Noisette to lose the SSA position.  As discussed above, the Court concludes that no reasonable juror could conclude that Imhoff was motivated by retaliatory or discriminatory animus against Noisette.  Noisette asserts that Imhoff "demonstrated his clear disdain for . . . Noisette," Dkt. 47 at 44, but the evidence he cites offers no support for that assertion—rather, it merely shows that Imhoff believed that Noisette should be required to follow the competitive process and that the outcome of that process was not a sure thing.  *See* Dkt. 49-3 at 35; Dkt. 47-13 at 2; Dkt. 47-12 at 15–16.  Moreover, even if his "deselection" decision was motivated by improper animus, there is no evidence in the record that Imhoff communicated any view to Coston about the proper outcome of the interview process, or that anything he did was the proximate cause of Coston's decision not to select Noisette in the competitive process.  *See Staub*, 562 U.S. at 420.

Issues of causation aside, Noisette's claims about his superior qualifications and about the interview notes each fail.  As the D.C. Circuit has explained, the district court "does not sit as [a] 'super-personnel department that reexamines an entity's business decisions.'"  *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).  Evidence that an employer "misjudged an employee's performance or qualifications" is relevant "if the employer made an error too obvious to be unintentional," in which case the court might be able to infer pretext.  *Id.* Otherwise, "the court must respect the employer's unfettered discretion to choose among qualified candidates."  *Id.*  For that reason, "a disparity in qualifications, standing alone, can

support an inference of discrimination only when the qualification gap is 'great enough to be inherently indicative of discrimination'—that is, when the plaintiff is 'markedly more qualified,' 'substantially more qualified,' or 'significantly better qualified' than the successful candidate." *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)).   The D.C. Circuit's decision in *Hamilton* illustrates how this rule applies in practice.   There, the unsuccessful candidate had bachelor's and master's degrees in relevant fields, and nineteen years of relevant experience, compared to the successful candidate who had no college degree, little formal training, and only eight years of relevant experience.   *Id.* at 1353.   Yet, despite the fact that the unsuccessful candidate "had far more formal training and education," "significantly greater technical expertise," and "broader [relevant] experience" than the successful candidate, the Court concluded that it was "a relatively close question" whether the qualifications gap was sufficient to support an inference of discrimination, and declined to hold that the gap was independently sufficient.   *Id.*   The Court accordingly declined to premise its decision on the qualifications gap alone.   *Id.*

If even the stark disparities in qualifications in *Hamilton* were not necessarily enough, standing alone, to support an inference of pretext, then the much smaller difference in paper qualifications here cannot support that inference.   Although Noisette had more managerial experience, Troncoso had more field experience and more experience with the St. Petersburg/Tampa office, including, most notably, two stints of two and four months as the acting official in the precise position for which he was applying.   Accordingly, a reasonable jury could not find that the differences in Noisette and Troncoso's qualifications were sufficiently "substantial" to support an inference of discrimination.

35

Finally, Noisette's concerns about the lack of interview notes carry little weight. Coston's contemporaneous call to Popoli communicated the same impression as was recorded in her declaration, which in turn matched the descriptions that Yasofsky and Lessoff gave of Noisette's performance. And Noisette's own statements corroborate that he considered the interview a "formality" and left home at four in the morning to travel to it. Under those circumstances, and in the absence of any direct or circumstantial evidence that any member of the interview panel harbored racial or retaliatory animus against Noisette, the lack of interview notes is not sufficient for any reasonable jury to find that Noisette was not selected due to any reason other than his performance at the interview.

## CONCLUSION

For the reasons discussed above, the government's motion for summary judgment under Fed. R. Civ. Pro. 56 is **GRANTED**. Because no part of the Court's analysis turned on the disputed government disclosures, Noisette's motion to strike and to take certain facts as established is **DENIED** as moot.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  September 30, 2016